UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROSALI DENISE BRYANT,

Plaintiff,

v.

NANCY A. BERRYHILL,

Defendant.

Case No. 18-cv-01514-DMR

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 18, 19

Plaintiff Rosali Bryant moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found Bryant not disabled and therefore denied her application for benefits under Title XVI of the Social Security Act, 42 U.S.C. § 401 et seq. The Commissioner cross-moves to affirm. For the reasons stated below, the court grants Bryant's motion in part and remands this case for further proceedings.

## I. PROCEDURAL HISTORY

Bryant filed an application for Supplemental Security Income ("SSI") benefits on July 31, 2014, which was initially denied on October 9, 2014 and again on reconsideration on March 2, 2015. Administrative Record ("A.R.") 171-179, 98-102, 106-111. On April 7, 2015, Bryant filed a request for a hearing before an Administrative Law Judge (ALJ). A.R. 112. The ALJ held a hearing on August 15, 2016, at which Bryant was represented by an attorney. A.R. 33-72. Following the hearing, the ALJ sent Bryant to two consultative examinations. *See* A.R. 15, 65-67.

On March 6, 2017, ALJ K. Kwon issued a decision finding Bryant not disabled. A.R. 12-27. The ALJ determined that Bryant has the following severe impairments: cerebellar ataxia with gait disturbance, depressive disorder, and anxiety disorder. A.R. 17. The ALJ found that Bryant retains the following residual functional capacity (RFC):

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform occasional postural, and no climbing ladders, ropes and scaffolds, can perform no work at heights or moving heavy hazardous machinery as safety precautions, is limited to simple and routine work with very little changes in the work setting equivalent to unskilled tasks with a maximum specific vocational preparation (SVP) of 2, with no interaction with the public.

A.R. 19.

Relying on the opinion of a vocational expert (VE) who testified that an individual with such an RFC could perform other jobs existing in the economy, including laundry worker II; bakery worker, conveyor; and basket filler, the ALJ concluded that Bryant is not disabled. A.R. 26.

The Appeals Council denied Bryant's request for review on February 23, 2018. A.R. 1-6. The ALJ's decision therefore became the Commissioner's final decision. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011). Bryant then filed suit in this court pursuant to 42 U.S.C. § 405(g).

## II. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[1] and that is expected to result in death or to last for a continuous period of at least twelve months. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

1. At the first step, the ALJ considers the claimant's work activity, if any. If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

---

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

2

2.    At the second step, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

3.    At the third step, the ALJ also considers the medical severity of the claimant's impairment(s). If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4.    At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5.    At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work. If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled. If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

III.    **FACTUAL BACKGROUND**

A.    **Bryant's Testimony**

Bryant was 26 years old on the date of the hearing. A.R. 41. She lives with her mother and brother. A.R. 41.

Bryant testified that she completed her associate's degree in seven years. A.R. 41-42. She received accommodations in college, including having a note-taker, a scribe for test-taking, additional time for tests, and the option of taking tests in "quiet rooms." A.R. 43-44. She testified that she needed a scribe for test-taking because she does not write fast enough during tests with time limits. A.R. 62.

Bryant's first job was a part-time position at Napa Valley Vacuum and Sewing starting in

3

2015. She was responsible for taking out the trash and recycling, cleaning bathrooms, shredding, filing, vacuuming, and dusting around the store. A.R. 45. She enjoyed the job but left because she needed to work more than five hours per week, which was all the store offered her. A.R. 45, 48. According to Bryant, if the store had scheduled her for 20 or 30 hours per week, she would have continued working there. A.R. 45.

In her current position, she works in the accessories section at Marshall's where she organizes and cleans the displays. A.R. 45-46. She works between 16 and 25 hours per week and enjoys her work. A.R. 46-47. Bryant testified that if Marshall's increased her hours to 35 hours per week, she "probably could" work that schedule, although she stated, "I don't know how much I could handle because I've never been tested to the limit . . ." A.R. 47. Bryant's job coach spends about two to three hours with her per day at Marshall's. While she is working, she talks with her job coach frequently. A.R. 54-55. The job coach supervises and assists her and watches to make sure she does not fall. A.R. 55. She feels like "[she's] doing all the things that [Marshall's] want[s] [her] to do" and testified that she "feel[s] good" at the end of her shifts. A.R. 54, 65. Bryant testified that she was interested in the position at Marshall's and that she received assistance in applying from vocational rehabilitation. A.R. 59-60.

The ALJ questioned her about whether she has problems with falling. Bryant testified that it does not "happen a lot," and that "it just happens every now and then when I don't eat or drink enough." A.R. 55. She testified that she had last fainted while working outside when it was hot and humid. A.R. 56.

Bryant is not taking any medications and does not see any doctors regularly, including any mental health practitioners. A.R. 51-52, 56. When asked if she feels like "there's any mental health issues that keep [her] from working," she responded as follows:

> A.    No.
>
> Q.    Okay. It's the history of the ataxia, the Cerebella Ataxia?
>
> A.    It's probably all the same. I wouldn't know. I don't really like talking to a whole lot of people. . . . I'm not very social. I don't like a lot of people per say [sic].

A.R. 58.

Bryant testified that on a typical day, she wakes up between 7:00 am and 9:00 am and stays in her room watching Netflix. She does not like to interact with her mother and brother because she does not get along with them. A.R. 58. She tries to limit the amount of time she spends outside of her room cleaning, cooking, and doing the dishes because she usually ends up arguing with her mother. A.R. 58-59. She is able to dress, feed, and bathe herself. She also prepares her own meals and does her own laundry. A.R. 59. She has a boyfriend she spends time with. A.R. 51. Bryant does not have a driver's license and walks or takes the bus to get around. A.R. 48, 50. She is able to get to work by herself. A.R. 59.

### B. Relevant Medical Evidence

#### 1. State Agency Medical Consultants

On September 30, 2014, state agency medical consultant G. Spellman, M.D. reviewed the records and opined that Bryant is able to do sedentary work with no balancing or climbing ladders, ropes, or scaffolds, and can occasionally climb, stoop, kneel, crouch, and crawl. A.R. 80-82. A. Dipsia, M.D., concurred in the opinion on February 23, 2015. A.R. 90-94.

#### 2. Examining Physicians

##### a. John Kiefer, Psy.D.

John Kiefer, Psy.D., performed a psychological evaluation of Bryant on May 21, 2013. A.R. 315-319. Dr. Kiefer observed that Bryant "gave the initial impression of being under the influence of some recreational substances," as she had difficulty walking and bumped into a chair. A.R. 315. However, upon questioning, Dr. Kiefer determined that Bryant's "medical problems . . . would account for the observations." A.R. 315. Bryant reported a history of cerebral ataxia. A.R. 316. Upon examination, Bryant's thought processes were logical and goal oriented. Her "[s]peech was normal rate and relevant content," and her thought content was appropriate. Her affect was pleasant and congruent with her stated mood. Her intellectual functioning appeared to be within average range. A.R. 317. Bryant's concentration was within normal limits, but she was unable to demonstrate some abstract thinking. Her judgment and insight were good. A.R. 318. Dr. Kiefer diagnosed her with cerebral ataxia and history of fractured femur and assessed a GAF score of 70. A.R. 318.

United States District Court
Northern District of California

Dr. Kiefer opined that Bryant's ability to "understand, remember and carry out very short and simple instructions" and "understand and remember detailed and complex instructions" is good. He also found that Bryant has a "good" ability to maintain attention and concentration, accept instruction from a supervisor and respond appropriate, interact with coworkers, sustain an ordinary routine without special supervision, complete a normal workday/workweek without interruptions at a consistent pace, and deal with various changes in the work setting. A.R. 319.

### b. Robert Tang, M.D.

Robert Tang, M.D., performed a comprehensive internal medicine evaluation of Bryant on June 11, 2013. A.R. 321-324. Dr. Tang noted that Bryant's gait was normal, and that she was able to tandem walk although she was wobbly. She was able to complete toe and heel walk with a hyperactive response of waving her arms. A.R. 322. She had full range of motion in her spine, lumbar region and all joints. Fine finger dexterity was intact to alternating finger touch and handling small objects. A.R. 323. Dr. Tang diagnosed slow slurred speech, history of cerebellar ataxia, with past history of decreased fine motor movement. He also noted that "fall cautions should be instituted." A.R. 324.

Dr. Tang opined that Bryant had no limitations other than working at heights and around heavy machinery, and occasional limitations for climbing and balancing. A.R. 324.

### c. Les P. Kalman, M.D.

Les P. Kalman, M.D., Psy.D., performed a consultative psychological examination of Bryant on September 15, 2016. A.R. 458-465. Dr. Kalman found Bryant to be a fair historian and observed her "exhibiting some shuffling, poor coordination difficulties and shaking sometimes." Bryant stated that she was emotionally "okay." A.R. 458. Bryant's speech was slow and slightly slurred. She was alert and oriented. She could not add, subtract, or multiply and became confused. According to Dr. Kalman, her intelligence was below average. A.R. 459. Her insight was fair and judgment was good. Her thought process was logical and goal directed. A.R. 460.

Dr. Kalman diagnosed Bryant with a mild intellectual disability. A.R. 461. He opined that Bryant "is able to do everything but is limited by cognitive aspects." Based on his evaluation, he concluded that Bryant can understand, remember, and perform simple oral and written

instructions.  She is able to maintain regular attendance in the workplace and perform work activities on a consistent basis without special or additional supervision.  A.R. 460.  Bryant is also able to complete a normal workday or workweek without interruption, accept instructions from supervisors, interact with coworkers and the public, and deal with the usual stresses encountered in competitive work.  A.R. 461.

Dr. Kalman assessed Bryant with marked restrictions in the abilities to understand, remember, and carry out complex instructions and make judgments on complex work-related decisions.  A.R. 462.

### d.     Edie Glantz, M.D.

Edie Glantz, M.D., performed a consultative neurological examination of Bryant on September 20, 2016.  A.R. 468-478.  Bryant reported that when she was in elementary school, she was "clumsy," and that she has gotten slightly more clumsy since then.  She reported that she currently stumbles when walking about once per month, but "has not fallen in many years."  A.R. 474.

Dr. Glantz observed that Bryant was able to get out of her chair without using her arms but was "generally clumsy."  She could get on and off the exam table independently and could pick up a paperclip off the table with either hand "but with some clumsiness and effort."  A.R. 475.  Bryant's coordination was "clumsy and disorganized for rapid alternating movements in all four extremities," and was also mildly slow.  Bryant had positive Romberg, mildly ataxic gait, and mildly impaired tandem.  She was able to walk around the room without a walking assistive device, was able to stand on her toes briefly, and had dysmetria for finger-to-nose testing bilaterally and heel-knee-shin testing bilaterally.  A.R. 476.

Bryant's fund of knowledge was normal and her concentration was intact.  She recalled three out of three objects after delay and distraction.  A.R. 477.

Dr. Glantz diagnosed cerebellar degeneration, possible type 6 with positive autosomal dominant family history.  A.R. 478.  She noted that Bryant's condition was progressive and hereditary with no treatment or cure.

Dr. Glantz opined that Bryant can stand and walk for up to six hours and could benefit

from a walking assistive device on uneven terrain.  According to Dr. Glantz, Bryant can lift and carry 25 pounds frequently and 50 pounds occasionally, although her incoordination may impact her ability at times.  She should never be on ladders, scaffolds, or ropes in light of her incoordination.  She can do occasional reaching, handling, fingering, and feeling, and is limited by her dysmetria from her ataxia of the upper extremities.  Additionally, Bryant should never work around unprotected heights or heavy machinery.  A.R. 478.

### 3. Other Sources

#### a. Sara Bryant

Bryant's mother, Sara Bryant, completed a third party adult function report on August 27, 2014.  A.R. 201-209.  According to Ms. Bryant, Bryant's "degenerative disability . . . affects her socialization—it's difficult for her to work under someone else's control."  A.R. 201.  She states that "the disability affects [Bryant's] social skills—interactions, speech, etc.  She is easily overwhelmed when misunderstood.  Has lack of control—loudness, reactions, progress very negative.  As [Bryant's] disability worsens, she becomes more isolated—prefers being alone."  A.R. 206.  Ms. Bryant states that Bryant has difficulty with lifting, walking, stair climbing, understanding, squatting, sitting, seeing, following instructions, bending, kneeling, memory, using hands, standing, talking, completing tasks, getting along with others, reaching, hearing, and concentration.  A.R. 206.  According to Ms. Bryant, Bryant can follow written instructions "well enough, but [she] easily gets confused—needs more info/time."  With spoken instructions, Bryant gets "more confused," and the instructions are "harder to follow—[she] needs simplification/repeating."  A.R. 206.

#### b. Angela E. G. Carreon, FNP

Angela E.G. Carreon, FNP, completed a short form evaluation for mental disorders for Bryant on September 26, 2014.  A.R. 341-344.  Ms. Carreon, who is Bryant's treating provider at Community Health Clinic Ole, noted that Bryant has cerebral ataxia, with tremor and slurred speech, slightly distracted concentration, impaired memory, and below average intelligence.  A.R. 341.  Bryant's mood and affect were normal and appropriate.  Thought process associations were tangential and judgment was intact.  A.R. 342.  Ms. Carreon opined that Bryant has "good"

abilities in most areas, including the ability to understand, remember, and carry out complex and simple instructions. However, she determined that Bryant's ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, interact appropriately with the public, and respond appropriately to changes in a work setting was "fair." A.R. 343.

### c. Sean Nunez

The record contains an undated letter from Sean Nunez of Napa Valley Support Services. A.R. 356. Mr. Nunez wrote that Bryant was referred to Napa Valley Support Services by the California Department of Vocational Rehabilitation. Following an assessment, Bryant was put on a modified duty work program that avoided requiring her to lift more than ten pounds and sitting or standing for prolonged periods. Staff observed that Bryant's gait was unsteady, and that she was unsteady when sitting down or standing up "and that she was essentially 'falling' into her seat." Additionally, Bryant had difficulty working as a receptionist due to her slow and very labored speech. Mr. Nunez opined that Bryant's "physical limitations, in terms of her unsteady movement and labored speech make it unlikely that [she] would find herself to be competitive in an office environment at this time." A.R. 356.

### d. Jeannie Smith

Jeannie Smith, Program Director of Napa Personnel Systems, a component of Napa Valley Support Services, wrote a letter on July 7, 2016 in which she explains that Napa Personnel Systems has provided Bryant with ongoing employment services since August 2014. A.R. 400. Ms. Smith states that the agency provides Bryant with job coaching supervision at her job at Valley Vacuum where Bryant works approximately five hours per week providing cleaning duties and general assistance. Her employer "is sympathetic with her disability but cannot afford to offer her more works [sic] hours, as she is not very productive." According to Ms. Smith, Bryant is very slow moving due to her cerebellar ataxia and slow in speech due to her speech and language impairment. She states that Bryant "does not work at a competitive level" and "would require a very understanding employer at any work site and would require a Job Coach to assist her in keeping the job." A.R. 400.

On August 24, 2016, Ms. Smith wrote an update to her previous letter about Bryant. A.R.

416. In her letter, she explains that the owner of Valley Vacuum asked her organization to find Bryant another position, "as he wasn't sure how much longer he could keep her." Napa Valley Support Services assisted Bryant in obtaining a position at a Marshall's store, helping her with completing the application and choosing appropriate attire for the interview. Bryant's employment specialist disclosed her eligibility for services to the employer, who hired Bryant with the knowledge that she would need assistance. According to Ms. Smith, Bryant "is a good cleaner and straightener but completes tasks at about 25% of the pace of what the average worker would complete." She also lacks organizational skills; "[f]or example, instead of removing small portions of product from the shelves to clean them, she takes everything off of a large shelf to clean and then cannot recall where everything goes back." Bryant's job coach is on-site with her approximately 60% of the time, and her employer does not want the job coaching to decrease. A.R. 416. Ms. Smith states that Bryant is easily distracted with conversation and requires prompts from her job coach to complete her work tasks. A.R. 417.

Ms. Smith states that Bryant is not an accurate reporter of her limitations. She opines that Bryant "does not work at a competitive level," and "requires a very understanding employer at any work site and would require a Job Coach to assist her in keeping a job." A.R. 417. According to Ms. Smith, "it is not determined yet if [Bryant] can keep a job without job coaching[.]" A.R. 417.

## IV. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a mere scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec.*

*Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V. ISSUES PRESENTED

Bryant argues that the ALJ erred at step three in determining that she does not meet or equal the criteria of Listings 12.04 and 12.06. In the alternative, Bryant argues that the ALJ erred at step four in determining her RFC by improperly weighing the medical opinions, rejecting lay witness testimony, and assessing Bryant's credibility.

The Commissioner cross-moves to affirm, arguing that the ALJ's decision is supported by substantial evidence and is free of legal error.

## VI. DISCUSSION

Bryant's step three argument relies in part on the ALJ's purported errors with respect to the lay opinions by Mr. Nunez and Ms. Smith. *See* Mot. 12-16. Therefore, the court will first analyze Bryant's step four argument before considering the step three argument.

### A. The Determination of Bryant's RFC

#### 1. Weighing of the Medical Evidence

The ALJ discussed the medical evidence and stated that she gave partial weight to the assessments of the state agency medical consultants, Dr. Spellman and Dr. Dipsia, and partial weight to the opinion of examining physician Dr. Glantz. Bryant argues that the ALJ erred in giving only partial weight to these opinions and rejecting portions of their opinions.

##### a. Legal Standard

Courts employ a hierarchy of deference to medical opinions based on the relation of the doctor to the patient. Namely, courts distinguish between three types of physicians: those who treat the claimant ("treating physicians") and two categories of "nontreating physicians," those

who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("non-examining physicians"). *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a non-examining physician's opinion. *Id*.

The Social Security Act tasks the ALJ with determining credibility of medical testimony and resolving conflicting evidence and ambiguities. *Reddick*, 157 F.3d at 722. A treating physician's opinion, while entitled to more weight, is not necessarily conclusive. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). To reject the opinion of an uncontradicted treating physician, an ALJ must provide "clear and convincing reasons." *Lester*, 81 F.3d at 830; *see, e.g.*, *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (affirming rejection of examining psychologist's functional assessment which conflicted with his own written report and test results); *see also* 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). If another doctor contradicts a treating physician, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount the treating physician's opinion. *Lester*, 81 F.3d at 830. The ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citation omitted). "[B]road and vague" reasons do not suffice. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). This same standard applies to the rejection of an examining physician's opinion as well. *Lester*, 81 F.3d at 830-31. A non-examining physician's opinion alone cannot constitute substantial evidence to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984), though a non-examining physician's opinion may be persuasive when supported by other factors. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (noting that opinion by "non-examining medical expert . . . may constitute substantial evidence when it is consistent with other independent evidence in the record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from

12

claimant). An ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa v. Callahan*, 143 F.3d 1240, 1244 (9th Cir. 1998) (citation omitted). An opinion that is more consistent with the record as a whole generally carries more persuasiveness. *See* 20 C.F.R. § 416.927(c)(4).

### b.     Analysis

#### i.     Dr. Spellman and Dr. Dipsia

In September 2014, Dr. Spellman, a state agency medical consultant, reviewed the records and opined that Bryant is able to do sedentary work with occasional postural activities, including climbing, stooping, kneeling, crouching, and crawling. A.R. 80-82. Sedentary work is defined in the regulations as work "involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties." SSR 83-10. Dr. Dipsia subsequently agreed with Dr. Spellman's opinion. A.R. 90-94.

The ALJ accorded this assessment partial weight, rejecting the restriction to sedentary work as follows: "The undersigned does not find the restriction to sedentary work necessary based on the record showing limited and minimal treatment with no indications she had difficulty lifting." A.R. 22. As noted, an ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa*, 143 F.3d at 1244 (citation omitted). Bryant argues that the ALJ erred with respect to the opinions of Drs. Spellman and Dipsia, noting that Sean Nunez of Napa Valley Support Services wrote that Bryant was put on a modified duty work program that avoided requiring her to lift more than ten pounds or sit or stand for prolonged periods. *See* A.R. 356. However, the fact that Napa Valley Support Services imposed a limitation on Bryant's lifting does not mean that she required one, and the record contains no medical opinions that Bryant could not lift more than 10 pounds. In fact, examining physician Dr. Glantz found that Bryant can occasionally lift and carry up to 50 pounds, and examining physician Dr. Tang imposed no limitations on the amount Bryant could lift and carry. A.R. 324, 468. The court concludes that the ALJ did not err in rejecting the portions of the opinions by Drs. Spellman and Dipsia restricting Bryant to sedentary work.

Dr. Glantz examined Bryant in September 2016. In her report, she made multiple references to observations of Bryant's "clumsiness." Dr. Glantz observed that Bryant was able to get out of her chair without using her arms but was "generally clumsy." She could get on and off the exam table independently and could pick up a paperclip off the table with either hand "but with some clumsiness and effort." A.R. 475. Bryant's coordination was "clumsy and disorganized for rapid alternating movements in all four extremities," and her coordination was also "mildly slow." A.R. 476. Based on her examination, Dr. Glantz opined that Bryant can stand and walk for up to six hours and lift and carry 25 pounds frequently and 50 pounds occasionally. She also opined that Bryant can do only occasional reaching, handling, fingering, and feeling, and that Bryant is limited by her dysmetria from her ataxia of the upper extremities. A.R. 478.

The ALJ stated that she gave partial weight to Dr. Glantz's assessment, rejecting the portion of her opinion regarding Bryant's ability to do only occasional reaching, handling, fingering, and feeling as follows:

> [T]he treatment record does not support manipulative limits showing no difficulties with handling other than a mention of writing slowly and use of a scribe at school. However, the record showed the claimant was able to use a keyboard without difficulty with the examiner's testing some clumsiness and effort but ability to pick up a paperclip off the table with either hand [sic].

A.R. 24. As Dr. Glantz's opinion about Bryant's manipulative limitations was contradicted by Dr. Tang, who found Bryant was unlimited with respect to reaching, handling, fingering, and feeling, the ALJ was required to provide "specific and legitimate reasons" supported by substantial evidence to reject Dr. Wiebe's opinion. *Lester*, 81 F.3d at 830.

The court finds that the ALJ did not meet this standard. The ALJ did not cite any evidence to support her statement that Bryant "was able to use a keyboard without difficulty," and the Commissioner identifies no support in the record for such a statement. *See* Opp'n 11. Moreover, the fact that Bryant was able to "pick up a paperclip off the table with either hand" does not support rejecting this portion of Dr. Glantz's opinion, because, as Dr. Glantz noted, Bryant could only pick up the paperclip was "with some clumsiness and effort." A.R. 475; *see also* A.R. 24. Dr. Glantz's observation about Bryant's ability to pick up a paperclip "with some clumsiness and

effort" supports *adopting* the manipulative limitations she assessed; it does not support rejecting them.

The Commissioner appears to concede this point but argues that any error with respect to Dr. Glantz's opinion was harmless. *See* Opp'n 11. The court agrees. The VE identified three positions that a person with Bryant's RFC could perform, and one of them is consistent with the limitations assessed by Dr. Glantz. Specifically, the VE identified the position of bakery worker, conveyor (DOT code 524.687-022). A.R. 26. Pursuant to the Dictionary of Occupational Titles, the requirements of the occupation of bakery worker, conveyor include only occasional reaching and handling, and do not include fingering and feeling. *See Dictionary of Occupational Titles*, 524.687-022, Bakery Worker, Conveyor Line (1991 WL 674401). The VE testified that 43,700 bakery worker, conveyor jobs exist in the national economy, with 3,500 jobs in California. A.R. 26. Under Ninth Circuit authority, this constitutes a significant number. *See Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 528-29 (9th Cir. 2014) (concluding that 25,000 national jobs and 2,500 jobs in California constitute "significant work"). Accordingly, the ALJ's error in rejecting Dr. Glantz's opinion about Bryant's manipulative limitations was harmless as it is "inconsequential to the ultimate nondisability determination," *Tommasetti*, 533 F.3d at 1038 (quotation omitted), since an ALJ need only identify one occupation that a claimant must be able to perform. *See* 20 C.F.R. § 404.1566(b) ("Work exists in the national economy when there is a significant number of jobs (in *one or more occupations*) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications." (emphasis added)).

### 2. Rejection of Lay Witness Testimony

Bryant next argues that the ALJ erred in rejecting the lay witness testimony of Jeannie Smith and Sean Nunez of Napa Valley Support Services and Sara Bryant, Bryant's mother.

Testimony provided by a lay witness as to a claimant's symptoms or how an impairment affects one's ability to work is competent evidence to be taken into consideration by an ALJ unless he or she expressly discounts such evidence and provides "reasons germane to each witness" for doing so. *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001); *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012). An ALJ need not "discuss every witness's testimony on an

1   individualized, witness-by-witness basis.  Rather, if the ALJ gives germane reasons for rejecting

2   testimony by one witness, the ALJ need only point to those reasons when rejecting similar

3   testimony by a different witness."  *Molina*, 674 F.3d at 1114.

4   With respect to the letters by Ms. Smith and Mr. Nunez, the ALJ stated three reasons for

5   giving them "little weight": 1) Ms. Smith and Mr. Nunez "are not acceptable medical sources and

6   cannot constitute documentation of severe or disabling vocational limitations"; 2) statements

7   indicating that Bryant has a "permanent disability" or "is unable to work" are issues reserved to

8   the Commissioner; and 3) "[t]he record shows that despite the claimant's impairments, she was

9   high functioning, with the ability to attend and coordinate school and work commitments albeit

10  with accommodations.  Thus, the claimant's daily activities and the overall record do not support

11  these letters opining disability."  A.R. 25.

12  The court concludes that the ALJ erred with respect to Ms. Smith and Mr. Nunez's

13  statements.  The first and second reasons provided by the ALJ—that Nunez and Smith are not

14  acceptable medical sources and that the question of whether an individual is disabled is an issue

15  reserved to the Commissioner—are merely statements of the law.  By themselves, they do not

16  amount to "germane reasons" to discount their observations about how Bryant's impairments

17  affect her ability to work.  The remaining reason, that Bryant is "high functioning, with the ability

18  to attend and coordinate school and work commitments albeit with accommodations," has little

19  basis in the record and is not germane to these witnesses, because the record does not support the

20  conclusion that Bryant was "high functioning" based on her ability to work and attend school, and

21  the ALJ's statement minimizes the extent to which Bryant required accommodations to work and

22  attend school.  Specifically, Ms. Smith's letters describe the *significant* accommodations that

23  Bryant requires in order to remain employed, including requiring the assistance of on-site job

24  coaching approximately 60% of the time.  Ms. Smith describes the job coaching supervision her

25  organization provided to Bryant for two years, explaining that Bryant's first employer, Valley

26  Vacuum, could only afford to offer Bryant five hours per week of work because "she is not very

27  productive."  She also required "Job Coach prompts to complete her work tasks" at that position.

28  A.R. 400.  As Bryant testified, her job duties in that position included taking out the trash and

16

recycling, cleaning bathrooms, shredding, filing, vacuuming, and dusting. A.R. 45.

In a follow-up letter, Ms. Smith states that the owner of Valley Vacuum had asked Napa Valley Support Services to "find her something else, as he wasn't sure how much longer he could keep her." She then explains that in Bryant's current position at Marshall's, she completes tasks at only 25% of the pace of an average worker and is slow-moving and easily distracted. As noted, Bryant's job coach is on-site with her approximately 60% of the time, and Ms. Smith states that Bryant's employer does not want the job coaching to decrease. A.R. 416-417. In his letter, Mr. Nunez describes additional challenges that Bryant faces, including unsteadiness and speech that is difficult to understand. A.R. 356.

As to Bryant's ability to attend school, she testified that it took her seven years to complete a two-year associate's degree, and that she required a note-taker, scribe for test taking, additional time for tests, and quiet rooms for test-taking. A.R. 41-44.

This evidence does not support the ALJ's statement that Bryant is "high functioning" based on her ability to "attend and coordinate school and work commitments albeit with accommodations." Under the regulations applicable at the time of the ALJ's decision, lay witness testimony could be introduced "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06-3P.[2] While the ALJ could properly disregard the portions of Ms. Smith and Mr. Nunez's letters opining on the ultimate issue of whether Bryant is able to work, she was not entitled to disregard their observations without providing a germane reason for doing so. *Molina*, 674 F.3d at 1114.

Bryant also argues that the ALJ erred with respect to the statement by her mother, Sara Bryant. Ms. Bryant states that Bryant has difficulty with lifting, walking, stair climbing, understanding, squatting, sitting, seeing, following instructions, bending, kneeling, memory, using hands, standing, talking, completing tasks, getting along with others, reaching, hearing, and concentration. A.R. 206. The ALJ gave the following explanation for giving Ms. Bryant's statement "little weight":

---

[2] The Social Security Administration rescinded SSR 06-3p effective March 27, 2017, after the ALJ's March 6, 2017 decision. *See* Federal Register Notice Vol. 82, No. 65, p. 16869.

> [I]t is a lay opinion based upon casual observation, rather than objective medical and testing. The observations of such layperson certainly do not outweigh the accumulated medical evidence regarding the extent to which the claimant's limitations can reasonably be considered severe. Overall, this statement lacks substantial support from objective findings in the record, which demonstrates good daily activities including the claimant's ability to work and attend school.

A.R. 25.

The court finds that these are not germane reasons to reject Ms. Bryant's statement. The lack of support in the medical record is not a germane reason to reject her statement. *See Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009) (under Ninth Circuit law, ALJ may not discredit lay witness testimony as not supported by medical evidence in the record). As the Ninth Circuit has observed, "[t]he fact that lay testimony and third-party function reports may offer a different perspective than medical records alone is precisely why such evidence is valuable at a hearing." *Diedrich v. Berryhill*, 874 F.3d 634, 640 (9th Cir. 2017) (citing *Smolen*, 80 F.3d at 1289). Thus, "[a] lack of support from medical records is not a germane reason to give "little weight" to those observations." *Id.* To the extent the ALJ rejected Ms. Bryant's statements as inconsistent with Bryant's ability to work and attend school, that is not a germane reason for doing so for the same reasons discussed above.

In sum, the ALJ erred by failing to provide germane reasons to reject the lay statements.

### 3. Bryant's Credibility Assessment

Bryant next argues that the ALJ erred in assessing her credibility.

### a. Legal Standard

In general, credibility determinations are the province of the ALJ. "It is the ALJ's role to resolve evidentiary conflicts. If there is more than one rational interpretation of the evidence, the ALJ's conclusion must be upheld." *Allen v. Sec'y of Health & Human Servs.*, 726 F.2d 1470, 1473 (9th Cir. 1984) (citations omitted). An ALJ is not "required to believe every allegation of disabling pain" or other nonexertional impairment. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989) (citing 42 U.S.C. § 423(d)(5)(A)). However, if an ALJ discredits a claimant's subjective symptom testimony, the ALJ must articulate specific reasons for doing so. *Greger v.*

*Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006). In evaluating a claimant's credibility, the ALJ cannot rely on general findings, but "must specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Id*. at 972 (quotations omitted); *see also Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (ALJ must articulate reasons that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."). The ALJ may consider "ordinary techniques of credibility evaluation," including the claimant's reputation for truthfulness and inconsistencies in testimony, and may also consider a claimant's daily activities, and "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Smolen*, 80 F.3d at 1284.

The determination of whether or not to accept a claimant's testimony regarding subjective symptoms requires a two-step analysis. 20 C.F.R. §§ 404.1529, 416.929; *Smolen*, 80 F.3d at 1281 (citations omitted). First, the ALJ must determine whether or not there is a medically determinable impairment that reasonably could be expected to cause the claimant's symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); *Smolen*, 80 F.3d at 1281-82. Once a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to the severity of symptoms "based solely on a lack of objective medical evidence to fully corroborate the alleged severity of" the symptoms. *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (en banc) (citation omitted). Absent affirmative evidence that the claimant is malingering, the ALJ must provide "specific, clear and convincing" reasons for rejecting the claimant's testimony. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The Ninth Circuit has reaffirmed the "specific, clear and convincing" standard applicable to review of an ALJ's decision to reject a claimant's testimony. *See Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014).

### b. Analysis

The ALJ found that Bryant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Bryant's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with significant functional limitations resulting in disability for the reasons explained in this decision." A.R. 20.

United States District Court
Northern District of California

The ALJ provided one reason for discounting Bryant's testimony: Bryant's engagement "in a somewhat normal level and range of daily activity and interaction," including "attending school, working, spending time with her boyfriend, taking public transportation, preparing meals, performing chores, such as cleaning, dishes and laundry, performing personal care tasks, and shopping." A.R. 20. According to the ALJ, Bryant's "ability to participate in such activities is not entirely consistent with [her] allegations of disabling functional limitations." A.R. 20. This purported inconsistency between Bryant's statements about her symptoms and limitations and her daily activities is the only specific reason the ALJ offered to discount her testimony. Following this statement, the ALJ discussed the objective medical and educational/vocational evidence at length, but the ALJ did not tie any of this evidence to the adverse credibility determination or otherwise explain how the ALJ's interpretation of such evidence warranted that determination. *See* A.R. 20-25.[3]

As noted, in the absence of evidence of malingering, an ALJ must provide "specific, clear and convincing" reasons for rejecting the claimant's testimony. *Vasquez*, 572 F.3d at 591. Critical parts of these issues are tied to the ALJ's evaluation of the lay witness statements, which provide further detail about how Bryant's impairments impact her ability to work and the extent of her limitations, about which the court has already found error. Accordingly, the court refrains from analyzing the ALJ's credibility finding at this time. Under these circumstances, it makes sense on remand for the ALJ to reevaluate the credibility determination upon reevaluation of the lay witness statements.

### B.     The ALJ's Determination that Bryant did not Meet or Equal a Listing

Bryant also argues that the ALJ erred at step three in determining that she does not meet or

---

[3] The court notes that the Commissioner discusses several bases for the ALJ's credibility determination, including purported inconsistencies in Bryant's testimony. *See* Opp'n 13-15. However, the ALJ did not identify those bases or make findings of inconsistencies in the opinion. "Long-standing principles of administrative law require [this court] to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking." *Bray v. Comm'r of Soc. Sec. Admin*., 554 F.3d 1219, 1225-26 (9th Cir. 2009) (citation omitted). "A clear statement of the agency's reasoning is necessary because [the court] can affirm the agency's decision to deny benefits only on the grounds invoked by the agency." *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015).

equal the criteria of Listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders). According to Bryant, the ALJ committed reversible error because she evaluated Bryant's mental impairments under the obsolete versions of these listings. Bryant further argues that under either the obsolete mental listings or the revised mental listings, her impairments meet or equal both listings.

As noted above, at step three of the sequential evaluation process, the ALJ considers the medical severity of the claimant's impairments. If the claimant has an impairment that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 and meets the duration requirement, the ALJ will find that the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii). "The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (emphasis in original). "To *meet* a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her claim." *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999) (emphasis in original). "To *equal* a listed impairment, a claimant must establish symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment . . . ." *Id.* at 1099 (emphasis in original) (quoting 20 C.F.R. § 404.1526(a)). "If a claimant suffers from multiple impairments and none of them individually meets or equals a listed impairment, the collective symptoms, signs and laboratory findings of all of the claimant's impairments will be evaluated to determine whether they meet or equal the characteristics of any relevant listed impairment." *Id.* (citing 20 C.F.R. § 404.1526(a)). However, "'[m]edical equivalence must be based on medical findings," and "[a] generalized assertion of functional problems is not enough to establish disability at step three.'" *Id.* at 1100 (quoting 20 C.F.R. § 404.1526(a)).

The claimant bears the burden of establishing a prima facie case of disability under the listings. *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002); *see also* 20 C.F.R. § 404.1520(a)(4)(iii). "[I]n determining whether a claimant equals a listing under step three of the . . . disability evaluation process, the ALJ must explain adequately [the ALJ's] evaluation of alternative tests and the combined effects of the impairments." *Marcia v. Sullivan*, 900 F.2d 172,

176 (9th Cir. 1990).

Effective January 17, 2017, the Social Security Agency revised the medical criteria used to evaluate claims involving mental disorders. *See Revised Medical Criteria for Evaluating Mental Disorders*, 81 Fed. Reg. 66138, 66154, 66159 (Sept. 26, 2016) (2016 WL 5341732). These changes rely on the date of the ALJ's decision. 81 Fed. Reg. at 66138 n.1 ("[W]e will use these final rules on and after their effective date . . . We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions."). Here, the ALJ issued her decision on March 6, 2017, which was after the effective date. Accordingly, the versions of the listings that went into effect on January 17, 2017 apply in this case.[4]

---

[4] The operative versions of the listings are as follows:

12.04 Depressive, bipolar and related disorders (see 12.00B3), satisfied by A and B, or A and C:
    A. Medical documentation of the requirements of paragraph 1 or 2:
        1. Depressive disorder, characterized by five or more of the following:
            a. Depressed mood;
            b. Diminished interest in almost all activities;
            c. Appetite disturbance with change in weight;
            d. Sleep disturbance;
            e. Observable psychomotor agitation or retardation;
            f. Decreased energy;
            g. Feelings of guilt or worthlessness;
            h. Difficulty concentrating or thinking; or
            i. Thoughts of death or suicide.
        2. Bipolar disorder, characterized by three or more of the following:
            a. Pressured speech;
            b. Flight of ideas;
            c. Inflated self-esteem;
            d. Decreased need for sleep;
            e. Distractibility;
            f. Involvement in activities that have a high probability of painful consequences that are not recognized; or
            g. Increase in goal-directed activity or psychomotor agitation.
AND
    B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):
        1. Understand, remember, or apply information (see 12.00E1).
        2. Interact with others (see 12.00E2).
        3. Concentrate, persist, or maintain pace (see 12.00E3).
        4. Adapt or manage oneself (see 12.00E4).
OR
    C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
        1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of

The Commissioner does not dispute that the ALJ incorrectly applied the pre-January 17, 2017 regulations at step three of the analysis but argues that any error was harmless as the regulations "did not materially change" and there is no evidence supporting Bryant's claim that she meets or equals one of the listings under the applicable versions. Opp'n 7-8, n.4.[5] Bryant's

---

your mental disorder (see 12.00G2b); and
2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

12.06 Anxiety and obsessive-compulsive disorders (see 12.00B5), satisfied by A and B, or A and C:
    A. Medical documentation of the requirements of paragraph 1, 2, or 3:
        1. Anxiety disorder, characterized by three or more of the following;
            a. Restlessness;
            b. Easily fatigued;
            c. Difficulty concentrating;
            d. Irritability;
            e. Muscle tension; or
            f. Sleep disturbance.
        2. Panic disorder or agoraphobia, characterized by one or both:
            a. Panic attacks followed by a persistent concern or worry about additional panic attacks or their consequences; or
            b. Disproportionate fear or anxiety about at least two different situations (for example, using public transportation, being in a crowd, being in a line, being outside of your home, being in open spaces).
        3. Obsessive-compulsive disorder, characterized by one or both:
            a. Involuntary, time-consuming preoccupation with intrusive, unwanted thoughts; or
            b. Repetitive behaviors aimed at reducing anxiety.
    AND
    B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):
        1. Understand, remember, or apply information (see 12.00E1).
        2. Interact with others (see 12.00E2).
        3. Concentrate, persist, or maintain pace (see 12.00E3).
        4. Adapt or manage oneself (see 12.00E4).
    OR
    C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
        1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and
        2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

[5] The Commissioner further argues that Bryant waived any argument that she meets or equals

argument that she meets or equals Listing 12.04 and/or 12.06 relies heavily on the statements by lay witnesses Jeannie Smith and Sean Nunez to establish that she has extreme limitations with concentration, persistence, or pace. *See* Mot. 10-16. As noted, the court finds that the ALJ erred with respect to those lay witness statements. Accordingly, the court cannot determine whether the ALJ's error in applying the incorrect version of the listings was harmless and does not reach the merits of Bryant's listings argument at this time. On remand, the ALJ must reevaluate whether Bryant meets or equals Listings 12.04 and 12.06 using the applicable version of the regulations.

## VII.  CONCLUSION

For the foregoing reasons, Bryant's motion for summary judgment is granted in part. This matter is remanded for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated: September 3, 2019



Donna M. Ryu
United States Magistrate Judge
Judge Donna M. Ryu

---

Listings 12.04 and 12.06 for failure to raise it before the ALJ or with the Appeals Council. Opp'n 7-8. This argument is without merit. The ALJ herself raised the issue by analyzing whether Bryant met or equaled Listings 12.04 and 12.06. A.R. 18. Moreover, Bryant's failure to raise the issue before the Appeals Council does not prevent her from asking this court to consider it. *See Sims v. Apfel*, 530 U.S. 103, 112 (2000) (Social Security "[c]laimants who exhaust administrative remedies need not also exhaust issues in a request for review by the Appeals Council in order to preserve judicial review of those issues."); *see also Edlund v. Massanari*, 253 F.3d 1152, 1160 n.9 (9th Cir. 2001) (rejecting argument that plaintiff waived argument that he met a listing by failing to waive it with the Appeals Council, citing *Sims*).